IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-01915-PAB-KAS

GEORGINA PEREZ,

    Plaintiff,

v.

SUNBEAM PRODUCTS, INC. d/b/a Jarden Solutions, and
NEWELL BRANDS, INC.,

    Defendants.

_____

**ORDER**
_____

This matter is before the Court on Plaintiff's Motion to Strike the Proffered Expert Testimony of Robert H. Miller [Docket No. 96]. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

### I.   BACKGROUND

On November 23, 2018, plaintiff Georgina Perez purchased a multi-cooker made by defendants Sunbeam Products, Inc. ("Sunbeam") and Newell Brands, Inc. ("Newell").[1] Docket No. 96 at 5. The multi-cooker had a function that allowed it to be used as a pressure cooker. *Id.* at 4. On June 3, 2019, Ms. Perez used the multi-cooker's pressure cooking function to prepare beans. *Id.* at 5. Ms. Perez alleges, that when she touched the multi-cooker, it exploded, causing her serious injury. *Id.* In her

---

[1] On September 29, 2023, the Court denied in part Newell's motion for summary judgment, finding that Ms. Perez has created a genuine issue of material fact as to whether Newell is a "manufacturer" of Ms. Perez's multi-cooker under Colo. Rev. Stat. § 13-21-401(1). Docket No. 84 at 8.

amended complaint, Ms. Perez asserts eight claims against defendants, involving design defect, manufacturing defect, failure to warn, negligence, breach of implied warranty, breach of express warranty, and fraud, as well as a claim brought under the Colorado Consumer Protection Act. Docket No. 78 at 8–10, ¶¶ 55–63 (design defect), 10–12, ¶¶ 64–72 (manufacturing defect), 13–15, ¶¶ 73–81 (failure to warn), 15–18, ¶¶ 82–87 (negligence), 18–19, ¶¶ 88–114 (breach of implied warranty), 19–21, ¶¶ 96–107 (breach of implied warranty), 21–23, ¶¶ 108–114 (Colorado Consumer Protection Act claim), 23–25, ¶¶ 115–22 (fraud).

Defendants have designated Robert Miller, a mechanical engineer, as an expert in this case. Docket No. 96 at 2, 7. On July 29, 2022, Mr. Miller prepared an expert report regarding the safety of the multi-cooker's design. Docket No. 96-7. Ms. Perez chose not to depose Mr. Miller in this matter. Docket No. 97 at 6.

Ms. Perez seeks to exclude three opinions of Mr. Miller at trial: (1) an incident like the one Ms. Perez reports could not have occurred if the multi-cooker's lid was properly secured; (2) the multi-cooker has no design defects; and (3) when used properly, the multi-cooker is safe for consumer use. Docket No. 96 at 7–15; *see also* Docket No. 96-7 at 6–7.

## II.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91 (1993).  If challenged by a party opposing the testimony of an expert witness, "[Rule] 702 imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions."  *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation omitted).  However, "[t]he proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible."  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).  "[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."  *Id.* (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

To determine whether an expert opinion is admissible, the court must perform "a two-step analysis."  *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022); *see also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  First, the court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion.  *Roe*, 42 F.4th at 1180 (quoting Fed. R. Evid. 702).

Second, if the expert is sufficiently qualified, the proffered opinions must be assessed for reliability.  *Id.* at 1180–81; Fed. R. Evid. 702(b)–(d) (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").  To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328

F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592–93).  In assessing whether a methodology is reliable, a court may consider several non-dispositive factors, including "(1) whether the theory can be tested; (2) whether it is subject to peer review and publication; (3) the known or potential error rate; (4) the existence and maintenance of standards; and (5) the general acceptance in the relevant scientific community." *United States v. Foust*, 989 F.3d 842, 845 (10th Cir. 2021) (citing *Daubert*, 508 U.S. at 593-94).  However, courts have "broad discretion to consider a variety of other factors." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016).

Next, the court must assess whether the expert used sufficient facts and data as required by the methodology and whether the expert reliably applied the methodology to the facts of the case.  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008)*; see also Roe*, 42 F.4th at 1181.  To demonstrate the reliability of an opinion that is based solely on an expert's experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes).  Establishing reliability does not require showing that the expert's testimony is indisputably correct.  *United States v. Pehrson*, 65 F.4th 526, 540 (10th Cir. 2023); *see also Goebel v. Denver & Rio Grande W. R.R. Co.,* 346 F.3d 987, 991 (10th Cir. 2003) (discussing how the opinion is tested against the standard of reliability, not correctness).  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too

great an analytical gap between the data and the opinion proffered." *Roe*, 42 F.4th at 1181. "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

### III. ANALYSIS

#### A. Mr. Miller's Qualifications

Ms. Perez challenges Mr. Miller's qualifications to provide the expert opinions in his report. Docket No. 96 at 7. The entirety of her argument is that, "[w]hile Mr. Miller's background is as a mechanical engineer, his expertise is focused on electrical and wiring failures in home appliances, such as electrical heaters, electrical fans, humidifiers, and coffee makers"; "[h]is education and training is primarily on fire and arson investigations"; and "Mr. Miller has no education or training on pressure cookers or appliance explosions." *Id.* Defendants respond that he is qualified because "Mr. Miller is a mechanical engineer with more than thirty years of engineering experience in electrical and mechanical products and components" and that "[h]e has more than twenty-five years of experience in the development, design, manufacture and marketing of consumer electrical products." Docket No. 97 at 3.

In his expert report, Mr. Miller states that he has "thirty years of project and managerial engineering experience in the field of electrical and mechanical products and components." Docket No. 96-7 at 1. He received a Bachelor of Science degree in mechanical engineering from the University of Illinois in 1980 and has spent the last twenty-five years "in the development, design, manufacture and marketing of consumer electrical products." *Id.* Mr. Miller also claims to have "extensive experience in the investigation of fires, shocks, burns, explosions, lacerations and other types of incidents

5

involving electrical appliances and components." *Id.*  For twenty-three years, Mr. Miller worked at Lakewood Engineering & Manufacturing Co. ("Lakewood"), which was a large volume manufacturer of portable electric fans, portable electric heaters of various types, as well as fluorescent lights, and humidifiers.  *Id.*  In his capacity as an engineer, Mr. Miller "worked closely with the entire line of products produced by Lakewood in order to develop and ensure the safety and integrity of the designs, as well as the quality of the products throughout the entire manufacturing process."  *Id.*  As part of that work, Mr. Miller assisted in developing operating instructions and warning manuals for products.  *Id.*  Mr. Miller also worked for twenty years as Lakewood's liaison with Underwriter's Laboratories ("UL") and gained knowledge and experience with UL safety standards, as well as with the testing and evaluation of products and components to those standards.  *Id.* at 1–2.

The Tenth Circuit has held that "as long as an expert stays within the reasonable confines of his subject area, . . . a lack of specialization does not affect the admissibility of the expert opinion, but only its weight."  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quoting *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996) (alterations and internal quotation omitted)).  Accordingly, the question is whether the issues that Mr. Miller discusses in his report are "within the reasonable confines" of his expertise.  *See id.*

The Court is satisfied that Mr. Miller is qualified to provide the expert opinions in his report.  Mr. Miller has a Bachelor of Science in mechanical engineering and over twenty-five years of practical experience in the design and manufacture of household consumer products.  This includes experience with pressurized oil-filled heaters,

6

humidifiers, coffee makers, and steam irons, all of which involve products that use heated fluids. Docket No. 96-7 at 1–2. As a liaison with UL, Mr. Miller has extensive experience with the relevant industry standards that he relies upon in his report. That Mr. Miller does not appear to have direct experience designing pressure cookers does not disqualify him as an expert. Ms. Perez does not explain why Mr. Miller's training and experience in the design and manufacture of various household appliances does not carry over to pressure cookers. Furthermore, although Mr. Miller may have greater expertise in electrical and wiring failures in home appliances, this does not disqualify him from opining on household product design and compliance more generally. Because Mr. Miller's opinions regarding the multi-cooker's design and its compliance with applicable safety standards are within the reasonable confines of his expertise, he is qualified to opine on them. *See Ralston,* 275 F.3d at 970.

### B. Mr. Miller's Opinions

In his report, Mr. Miller asserts three opinions, each of which Ms. Perez seeks to exclude. *See* Docket No. 96 at 7–15. Mr. Miller's first opinion is that:

> 1. When the instructions contained in the Owner's Manual, on the lid label, on the lid markings and in the Recipe Book are followed, an incident as described by Georgina Perez cannot occur. Once the Bobber Valve moves up due to an increase in pressure in the vessel and engages the metal locking plate, no amount of force that can reasonably be applied by hand will rotate the lid in order to allow it to open and detach from the base until that internal pressure has decreased enough to allow the Bobber Valve to move to its retracted position. Further, if the lid was properly installed, it would require a twisting motion to rotate and move the lid thirty-five angular degrees in order to release the locking pin and open the multi-cooker.

Docket No. 96-7 at 6. Mr. Miller's second opinion is that:

> 2. The Sunbeam Crockpot Multi-Cooker, Model SCCPPC600V-1 is safe for consumer use and contains no design defects. Its design meets or exceeds all of the requirements and tests specified in the *Standard for Safety for Household Electric Cooking and Food Serving Appliances*, UL1026 and the *Standard for*

7

> *Safety for Pressure Cookers*, UL136 which are the industry standards for the design and manufacture of pressure cookers such as the Sunbeam Crockpot Multi-Cooker Model SCCPPC600-V1.  This model was tested, evaluated and listed with Underwriters' Laboratories Inc[.], under Listing File E189458.

*Id.* at 6–7.  Mr. Miller's third opinion is that:

> 3.  When used as intended per the instructions included with each unit, the Sunbeam Crockpot Multi-Cooker, Model SCCPPC600-V1 is safe for consumer use.  The instructions provide the user with adequate information to advise to the condition of pressure and high temperature and with clear and concise directions: for properly preparing the food/liquid: for attaching and securely locking the lid: for operating the controls to obtain the desired cooking cycle: for allowing for the cool down and de-pressurization once the cooking cycle is completed.

*Id.* at 7.

### 1. Mr. Miller's First and Third Opinions

Ms. Perez seeks to exclude Mr. Miller's first and third opinions, which she characterizes as "Mr. Miller's opinions that compliance with the Multi-Cooker's instructions and warnings render the Multi-Cooker safe for consumer use," on the grounds that they lack foundation and are unreliable.  Docket No. 96 at 7.

#### a. Contradictory Evidence

Ms. Perez claims that these opinions lack a foundation because they are contradicted by three pieces of evidence – namely, the recall notice, the report of a firm hired by defendants to investigate incidents of malfunctioning multi-cookers, and the deposition testimony of Daniel Sumser, Sunbeam's manager for product development. *Id.* at 7–11.

Ms. Perez argues that "[t]he recall notice alone invalidates Mr. Miller's opinions, given that it contradicts the representations and assurances in the product user manual." *Id.* at 8.  The recall notice states that "[t]he recalled Crock-Pot multi-cooker can pressurize when the lid is not fully locked.  This can cause the lid to suddenly detach while the product is in use, posing burn risks to consumers from hot food and

liquids ejected from the product." Docket No. 96-3 at 2. The remedy section of the recall notice further provides that:

> Consumers should immediately stop using the recalled Crock-Pot in pressure cooker mode, but may continue to use for slow cooking and sautéing. Consumers should contact Crock-Pot immediately to obtain a free replacement lid. Consumers who continue using the multi-cooker in pressure cooker mode while waiting for the replacement lid should be certain the lid is securely turned to the fully locked position by aligning the arrow on the lid with the lock symbol on the base.

*Id.* at 4. Ms. Perez maintains that the recall notice indicates that Mr. Miller's opinions lack foundation and "directly contradict Defendants' stated reason for recalling the Multi-Cooker."[2] Docket No. 96 at 8.

Ms. Perez cites no cases that stand for the proposition that a recall notice precludes an expert retained by the company subject to the recall notice from expressing opinions contrary to the notice. As the advisory committee notes to Rule 702 make clear, "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. However, courts exclude expert opinions when these opinions are based on a record that is so incomplete that the opinion is not based on "sufficient facts and data." *See, e.g., Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 558–59 (7th Cir.

---

[2] The parties debate the admissibility of the recall notice as a remedial measure under Federal Rule of Evidence 403. *See* Docket No. 97 at 8, Docket No. 100 at 6–8. The admissibility of the recall notice is immaterial to the Court's ruling on the present motion, and the Court declines to resolve the issue through this order.

2019) (defendant's expert's failure to interview the defendant or his supervisor or to review any deposition testimony resulted in her "reliance on an anemic and one-sided set of facts [which] casts significant doubt on the soundness of her opinion, and the court did not abuse its discretion by excluding it"); *Wells v. Kawasaki Motors Corp., U.S.A.*, 854 F. App'x 242, 248–49 (10th Cir. 2021) (unpublished) ("Even though Ms. Gill has relevant experience with warnings and cites some general studies of warning labels, we discern no abuse of discretion in the district court's decision to exclude her testimony because of insufficient factual support.  Ms. Gill cites merely a few deponents' testimony and one article on PWC warnings to support her point that consumers would not locate and read the on-product label, and cites no research or data to support her other points." (citations omitted)).

      Here, the recall notice states that the "multi-cooker can pressurize when the lid is not fully locked" and that "[c]onsumers who continue using the multi-cooker in pressure cooker mode while waiting for the replacement lid should be certain the lid is securely turned to the fully locked position by aligning the arrow on the lid with the lock symbol on the base."  Docket No. 96-3 at 2, 4.  Even if the statements in the recall notice are inconsistent with Mr. Miller's opinions, Ms. Perez has not shown why Mr. Miller is precluded from expressing an opinion that is inconsistent with the recall notice.  In his report, Mr. Miller states that he reviewed the "[r]ecall kit with replacement lid and written materials, warning labels," in addition to other materials and the results of his independent product testing.  Docket No. 96-7 at 2–3, ¶¶ 1–18.  Based on these materials and the results of his testing, Mr. Miller concluded that the multi-cooker is safe and does not have a design defect.  *Id.* at 6–7.  That the results of Mr. Miller's product

10

testing appear to be contrary to defendants' decision to issue a recall notice does not mean that the results of his independent testing are wrong or that he lacked sufficient facts and data in forming his opinions.  As such, any inconsistency between Mr. Miller's opinions and the recall notice is not a sufficient reason to exclude his opinions under Rule 702.

Ms. Perez further contends that Mr. Miller's opinions lack foundation because they are contradicted by the report produced by the company Exponent.  *Id.*  She alleges that defendants retained Exponent as a third-party engineering firm to evaluate the multi-cooker's design, an allegation which defendants do not refute.  *Id.*; *see generally* Docket No. 97.  Ms. Perez avers that the report Exponent provided on the issue hypothesizes that "(1) the lock pin was disengaging even when pressure remained in the unit, or (2) the lid may not be locking correctly before the unit starts pressurizing."  Docket No. 96 at 8 (citing Docket No. 96-4).  First, the document Ms. Perez attaches to her motion is ambiguous.  The first page of the document lists several safety mechanisms, but it is unclear whether these features were part of the multi-cooker's design at the time of Exponent's review or were suggested as future changes to the product's design.  Docket No. 96-4 at 1.  The document then presents three hypotheticals, which the Court presumes are hypothetical causes of the injuries reported to defendants prior to Ms. Perez's incident.  *See id.* at 2–4.  The document identifies particular safety mechanisms and a "testing plan" to determine whether the hypothesis is accurate.  *Id.*  The document does not discuss the results of any testing.  *Id.*  As such, the Exponent report Ms. Perez relies on provides no facts or data that contradict the results of Mr. Miller's testing or that undermine the reliability of his

11

opinions.  Even if the report did contain such information, Ms. Perez has not shown why Mr. Miller's independent testing does not adequately support his opinions.  There is no indication that Mr. Miller was aware of the Exponent report, that the report contradicts Mr. Miller's opinions, or that experts in Mr. Miller's field would have conducted a search for documents at Sunbeam that would have uncovered the Exponent report.  The Exponent report does not serve as a basis for excluding Mr. Miller's opinions.

Finally, Ms. Perez argues that Mr. Miller's opinions lack foundation because they are contradicted by the deposition testimony of Mr. Sumser, given in a different case against defendants in the United States District Court for the Southern District of Indiana.  *Id.* at 10; Docket No. 96-12 at 1.  Mr. Sumser, Sunbeam's manager of product development, testified that he was asked by Sunbeam to investigate complaints regarding the Sunbeam Multi-Cooker "leaking" and burning customers in 2018, but testified that he was never made aware of the Exponent report.  Docket No. 96 at 9 (citing Docket No. 96-12).  From this testimony, Ms. Perez extrapolates that, "[r]ather than recalling a million Multi-Cooker units, Defendants hid the Exponent report from Mr. Sumser." *Id.* at 10.  She maintains that, "[w]hile Mr. Miller acknowledges in his report that the subject Multi-Cooker was sold with a modified lid," *id.* at 9, – modifications which Mr. Sumser helped design, *see* Docket No. 96-12 at 6, 24:9–15 – Mr. Miller's opinions are unsupported because they do not account for the fact that defendants made modifications to the lid of the multi-cooker to avoid the kind of incident Ms. Perez describes in her complaint.  Docket No. 96 at 9.  She claims that "Mr. Miller's understanding of the changes made to the Multi-Cooker further emphasizes Mr. Miller's

12

failure to review all evidence and facts relevant to this case."[3] *Id.* at 9. She insists that "Mr. Miller clearly never spoke to or read the testimony of Mr. Sumser, nor did he make any effort to actually investigate or understand the purpose of Sunbeam's modifications to the Multi-Cooker." *Id.* at 10. In his report, Mr. Miller states that he reviewed Mr. Sumser's deposition and exhibits. Docket No. 96-7 at 2, ¶ 9. He also reviewed the "[r]ecall kit with replacement lid and written materials." *Id.* at 3, ¶ 18. Mr. Miller's report discusses the specific modifications defendants made to the lid of the multi-cooker that Ms. Perez bought. *Id.* at 5, ¶ 5. The Court finds Ms. Perez's assertion that Mr. Miller "clearly never . . . read the testimony of Mr. Sumser" is contradicted by Mr. Miller's report and concludes that the fact that Mr. Miller may not have talked to Mr. Sumser does not render Mr. Miller's report so deficient as to be "unsupported." That defendants chose to modify the lid of the multi-cooker does not necessarily show that the modified multi-cooker had a design defect if the lid was attached according to the directions or that the results of Mr. Miller's testing were wrong. Ms. Perez has not shown how defendants' failure to provide the Exponent report to Mr. Sumser during his investigation into reports of injuries from the multi-cooker has any bearing on the results of Mr. Miller's testing or undermines Mr. Miller's opinions based on these results.

Considering collectively the recall notice and the deposition testimony of Mr. Sumser, which Mr. Miller reviewed, and the Exponent report, which Mr. Miller did not review, Ms. Perez has not shown that the foundation for Mr. Miller's opinions is so

---

[3] Rule 702 does not require an expert to review "all" evidence, but rather "sufficient facts and data." Fed. R. Evid. 702(b).

lacking that his test results should be excluded as not being based on sufficient facts or data pursuant to Rule 702.

### b. Reliability of Mr. Miller's Opinions

Although Ms. Perez's motion is primarily focused on the arguments just discussed, her motion also asserts that Mr. Miller's first and third opinions should be excluded because they are based on unreliable test results. *See* Docket 96 at 6. As such, Ms. Perez claims that such opinions should be precluded. *Id.*

Mr. Miller states that he reviewed photographs of Ms. Perez's multi-cooker, relevant UL standards, UL records concerning testing and listing of the multi-cooker, various litigation filings and exhibits, and "design and manufacturing/quality documents produced by Sunbeam," among other documents. Docket No. 96-7 at 2. Mr. Miller also asserts that he relied on "[e]xamination, testing and evaluation of Sunbeam Crockpot Multi-Cooker exemplar units and re-fit lids." *Id.* His report begins by reviewing the facts and circumstances surrounding the incident as described by Ms. Perez. *Id.* at 3. The report continues by making several findings and observations. *Id.* at 3–6. The observations include a general description of the multi-cooker and the purported operation of the locking mechanism used while the pressure-cooking function is active. *Id.* at 4, ¶¶ 2–4. The report further details specific modifications made to the model Ms. Perez purchased from the original design and discusses how Mr. Miller knew that these modifications had been made. *See, e.g., id.* at 5, ¶ 5 ("This is evident by the inclusion of the red bobber valve."). The report's findings include the fact that UL evaluated and listed the multi-cooker, Model SCCPPC6000V-1, and that such a listing required the multi-cooker to comply with UL standards, including the standard for safety for household electrical cooking and food serving appliances, UL1026, and the standard for

14

safety for pressure cookers, UL136.  *Id.* at 3–4, ¶ 1.  The report states that, as part of the testing required for UL listing, a one-hundred-pound load was applied to the outermost point of the multi-cooker's lid during its operation.  *Id.*

The report also describes two tests performed on an exemplar multi-cooker.  *Id.* at 6, ¶¶ 6–7.  During one test, one cup of pinto beans was pressure-cooked and allowed to rest and depressurize for twenty minutes without opening the steam release valve.  *Id.*, ¶ 6.  The results of the test were that a small amount of steam remained in the multi-cooker, but that the device and its contents did not explode when the lid was removed.  *Id.*, ¶ 6.  In a separate test, three cups of beans were pressure-cooked.  *Id.*, ¶ 7.  Soon after the cooking finished, an attempt was made to open the lid.  *Id.*  Steam was released from the release valve for several minutes, but the lid could not be opened until the majority of the steam was released and no explosion occurred when the lid was removed.  *Id.*

Ms. Perez argues that Mr. Miller's opinions are unreliable because (1) it is unclear who conducted the tests Mr. Miller relies on, and (2) the tests appear to use a different model of multi-cooker than the one Ms. Perez purchased.  Docket No. 96 at 6; Docket No. 100 at 5.  Ms. Perez maintains that it is necessary to know who conducted these tests and that "[o]ne would think that if Mr. Miller personally conducted the tests described in his report, he would explicitly say he conducted such tests."  Docket No. 100 at 5.  It is true that Mr. Miller's report does not state that he conducted the tests he describes, and which Ms. Perez attaches photographs of.  However, defendant's response to the motion states that Mr. Miller performed the tests.  *See, e.g.*, Docket No. 97 at 5 ("Mr. Miller's report further includes a comprehensive description of his testing of

15

various exemplar Multi-Cookers, including a test recreating the recipe and facts as described by Plaintiff."). The Court will accept defendants' representation that Mr. Miller conducted these tests.[4]

Ms. Perez claims that the photographs of the testing suggest that the tests used different models of the multi-cooker than Ms. Perez used. Docket No. 96 at 6 n.1. This argument is insufficient to undermine the reliability of these tests or the applicability of these results to the facts of this case. Despite the photographs showing the control panel of the units tested, Ms. Perez does not identify which units differed from the multi-cooker that Ms. Perez used in any relevant way and therefore why the results of Mr. Miller's testing would be inapplicable to this case. Mr. Miller's report referred to tested multicookers as "exemplars," which indicates that they are, for the purposes he tested them, comparable. Courts have found that a perfect identity between a testing exemplar and the object of an accident is not necessary. *See Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 405–06 (W.D. Ky. 2018) ("Defendant cites no case stating that an expert's exemplar testing must be 'identical' to the incident in question."). Rather, "to be relevant, an accident reconstruction must be *substantially similar* to the original accident." *Id.* (citation and alterations omitted); *Thompson v. Ford Motor Co.*, No. 22-cv-00541-MDB, 2023 WL 9422974, at *9 (D. Colo. Dec. 11, 2023) ("Courts have held that experimental evidence must be 'made under conditions which are *substantially similar* to those which are the subject of the litigation.'" (quoting *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1443 (10th Cir. 1992))).

---

[4] If defendants representation that Mr. Miller conducted these tests is inaccurate, Ms. Perez will have the opportunity to seek appropriate remedies.

Ms. Perez identifies no characteristics of her multi-cooker that are not substantially similar to those of the exemplar. Furthermore, the conditions of the testing are substantially similar to the facts Ms. Perez alleges in her complaint or which may have occurred. *Compare* 96-7 at 6, ¶¶ 6–7, *with* Docket No. 78 at 3, ¶ 15. As such, to the extent Mr. Miller's opinions are based on these test results, they are sufficiently reliable to be admissible.

### 2. Mr. Miller's Second Opinion

Mr. Miller opines that "[t]he Sunbeam Crockpot Multi-Cooker, Model SCCPPC600V-1 is safe for consumer use and contains no design defects" and that its "design meets or exceeds all of the requirements and tests specified in the *Standard for Safety for Household Electric Cooking and Food Serving Appliances*, UL1026 and the *Standard for Safety for Pressure Cookers*, UL136 which are the industry standards for the design and manufacture of pressure cookers such as the Sunbeam Crockpot Multi-Cooker Model SCCPPC600-V1." Docket No. 96-7 at 6–7, ¶ 2.

Ms. Perez argues that this opinion is based on unsupported and unreliable principles. Docket No. 96 at 11. She states that UL standards are voluntary, that voluntary standards are, in many cases, drafted by the corporations that design and manufacture the product, and that defendants had to pay to obtain the UL listing. *Id.* (citing *Pfeiffer v. Eagle Mfg. Co.*, 771 F. Supp. 1133, 1137 (D. Kan. 1991)). In particular, Ms. Perez argues that compliance with UL standards is not a guarantee that a product is safe for consumer use and free of design defects. *Id.* She contends that Mr. Miller previously testified in a different case against defendants in United States District Court in the Eastern District of Texas that a UL listing is not a guarantee of safety. *Id.*; Docket No. 96-13 at 1. Based on this testimony, she contends that his

17

opinion is not reliable because UL standards are not consistent with the standard of care within the fields of product design and manufacture. Docket No. 96 at 12.

Defendants respond that, in addition to the the multi-cooker's compliance with UL standards, Mr. Miller relied on "his knowledge of the product, the newly designed lid, and his own testing of the product" to form his opinions. Docket No. 100 at 11. Defendants state that Mr. Miller's report does not claim that compliance with UL standards is a guarantee of safety, which is consistent with his prior testimony, but that his opinion that the multi-cooker has no design defects is not inconsistent with the fact that the UL listing is not a guarantee of safety. *Id.* at 11–12.

"Federal courts have consistently held that compliance with industry standards is relevant to a reliability determination under Rule 702." *Heer v. Costco Wholesale Corp.*, 589 F. App'x 854, 862 (10th Cir. 2014) (unpublished) (citing *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 454 (8th Cir. 2008)). Furthermore, in design defect cases, while "industry standards are not conclusive as to ordinary care in design," they "are admissible evidence." *Fabian v. E. W. Bliss Co.*, 582 F.2d 1257, 1261 (10th Cir. 1978) (applying New Mexico law); *see also Yampa Valley Elec. Ass'n, Inc. v. Telecky*, 862 P.2d 252, 257 (Colo. 1993) (en banc) ("Evidence of a defendant's compliance with applicable industry standards in a tort case is both relevant and admissible for purposes of determining whether the defendant either breached, or satisfied, the duty of care it owed to an injured plaintiff. Even though evidence of compliance with industry standards is admissible, such evidence is not conclusive on the issue of due care." (citations omitted)); *Tucker v. Wright Med. Tech., Inc.*, 2013 WL 1149717, at *9 n.11 (N.D. Cal. Mar. 19, 2013) ("Expert evidence about compliance with industry standards can be

considered on the issue of defective design, in light of all other relevant circumstances, even if such compliance is not a complete defense." (applying California law)).

To the extent that Ms. Perez argues that Mr. Miller should not be permitted to opine on UL standards because Mr. Miller has testified that they do not guarantee safety, the Court disagrees. That defendants may have helped develop UL standards or that they may have paid for UL to test and list their products does not refute Mr. Miller's assertion that UL standards represent industry standards. Compliance with industry standards is both relevant and admissible evidence. Because Ms. Perez has presented no evidence or made any non-conclusory arguments that UL standards do not represent industry standards, Mr. Miller will be permitted to opine on the multi-cooker's compliance with these standards. To the extent Ms. Perez argues that Mr. Miller's opinion lacks foundation because he relies on these standards, Ms. Perez has not shown these are inappropriate standards for an expert in Mr. Miller's field to rely on and ignores the other materials Mr. Miller reviewed to reach his conclusions. Finally, Mr. Miller's prior testimony that compliance with UL standards is not a guarantee of safety is not inconsistent with the fact that compliance with these standards is an indication that the multi-cooker does not have a design defect. As such, Ms. Perez's challenge to Mr. Miller's third opinion that the multi-cooker does not have a design defect is denied.

Because Mr. Miller's expert report establishes his expertise and the reliability of his opinions, and because Ms. Perez has failed to show that Mr. Miller's opinions lack foundation, the Court will deny Ms. Perez's motion.

IV.  CONCLUSION

It is therefore

**ORDERED** that Plaintiff's Motion to Strike the Proffered Expert Testimony of Robert H. Miller [Docket No. 96] is **DENIED**.

DATED June 13, 2024.

BY THE COURT:

_____
PHILIP A. BRIMMER
Chief United States District Judge