IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 21-cv-01915-PAB-KAS

GEORGINA PEREZ,

      Plaintiff,

v.

SUNBEAM PRODUCTS, INC. d/b/a Jarden Solutions, and
NEWELL BRANDS, INC.,

      Defendants.

---

**ORDER**

---

The matter before the Court is the Motion for a New Trial and Judgment as a

Matter of Law [Docket No. 228].  The Court has jurisdiction pursuant to 28 U.S.C.

§ 1332.

## I.    BACKGROUND

This case arises out of injuries plaintiff Georgina Perez sustained on June 3,

2019 while using a 6-Quart Express Crock Multi-Cooker manufactured by defendants

Sunbeam Products, Inc. ("Sunbeam") and Newell Brands, Inc. ("Newell").  Docket No.

59 at 2–6.  Ms. Perez originally filed suit on May 28, 2021 against defendants in the

District Court of Denver County, Colorado.  Docket No. 3.  Defendants removed the

case to federal court on July 14, 2021.  Docket No. 1.  On September 29, 2023, the

Court granted in part and denied in part Newell's motion for summary judgment, ruling

that there was a dispute of material fact as to whether Newell was a manufacturer of the

defective multicooker under Colo. Rev. Stat. § 13-21-401(1).  Docket No. 84 at 8.  On

June 13, 2024, the Court granted defendants' motion to strike Ms. Perez's supplemental expert disclosures, ruling that Ms. Perez's medical expert would not be able to testify regarding treatment information that was not disclosed before the close of discovery. Docket No. 140 at 9.  On June 14, 2024, during the first trial preparation conference, the Court denied defendants' motion in limine to exclude Ms. Perez from introducing evidence at trial that defendants had recalled the multicooker after her accident.  Docket No. 146; *see also* Docket No. 113.  On June 26, 2024, defendants filed a motion to reconsider the Court's ruling.  Docket No. 153.  The Court denied the motion to reconsider on November 18, 2024.  Docket No. 182.

Beginning on December 9, 2024, the Court held a five-day jury trial in this case. Docket Nos. 196–200.  At the close of Ms. Perez's evidence, defendants made two separate motions for a directed verdict.  Tr. at 466:4-488:13.  The Court denied both motions.  *Id.* at 488:24-491:8; 643:5-644:8.  On December 13, 2024, the jury returned a verdict in favor of Ms. Perez on her state law claim for the sale of a defective product and her state law claim for negligence.  Docket No. 207 at 1–2.  The jury awarded Ms. Perez $3,500,000 for non-economic losses or injuries and $2,000,000 for physical impairment and disfigurement.  *Id.* at 3.  The jury also awarded Ms. Perez $15,000,000 in exemplary damages against Sunbeam and $35,000,000 against Newell.  *Id.*  On May 29, 2025, the Court issued an order applying the relevant statutory damages caps to the jury's award of damages.  Docket No. 218.  The Court ordered Sunbeam to pay Ms. Perez $1,677,695.22 in actual damages and $1,677,695.22 in exemplary damages.  *Id.* at 25.  The Court ordered Newell to pay Ms. Perez $2,876,037.07 in actual damages

2

and $2,876,037.07 in exemplary damages. *Id.* at 26. Final judgment was entered the same day. Docket No. 219.

On June 26, 2025, defendants filed their motion for a new trial and judgment as a matter of law. Docket No. 228. Defendants renew their motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and seek a new trial under Rule 59. *Id.* at 2-3. Ms. Perez responded, Docket No. 231, and defendants replied. Docket No. 232.

## II.   LEGAL STANDARD

### A.  Rule 50(b)

Federal Rule of Civil Procedure 50 provides that judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Although courts are to review all of the evidence, there are limits as to what evidence they can consider. For example, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id*. Moreover, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 150-151. In other words, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that [the] evidence comes from disinterested witnesses." *Id.* (internal quotation and citation omitted).

3

Where a party properly moves for judgment as a matter of law prior to the case being submitted to the jury, that party may renew the motion after the jury returns its verdict.  *See* Fed. R. Civ. P. 50(a)(2), (b).  However, the Court should grant such relief "only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion." *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993).  The Court applies the same legal standard for a renewed motion under Rule 50(b) as is applied to the original motion for judgment as a matter of law under Rule 50(a).  *See, e.g.*, *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1269-70 (10th Cir. 2008).  However, there is an added limitation in that generally "[t]he renewed motion under Rule 50(b) cannot assert grounds for relief not asserted in the original motion." *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739-40 (10th Cir. 2007).  In diversity cases, federal law governs whether judgment as a matter of law or a new trial is appropriate, but "the substantive law of the forum state governs analysis of the underlying claim." *Valley View Angus Ranch, Inc. v. Duke Energy Field Servs., LP*, 410 F. App'x 89, 95 (10th Cir. 2010) (unpublished) (citations omitted).

### B.  Rule 59

Federal Rule of Civil Procedure 59(a) provides that "[t]he Court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  A motion for a new trial may be granted where "the district court concludes the 'claimed error substantially and adversely' affected the party's rights." *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008) (quoting *Sanjuan v. IBP, Inc.,* 160 F.3d 1291, 1297 (10th Cir. 1998)); *see also*

4

*Phillips v. Duane Morris, LLP*, No. 13-cv-01105-REB-MJW, 2015 WL 72336, at *1 (D. Colo. Jan. 5, 2015) ("In general, a motion for new trial 'is not regarded with favor and should only be granted with great caution.'") (quoting *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991)).

### III.   ANALYSIS

#### A.  <u>Motion for a New Trial</u>

Defendants' motion includes arguments that the Court should order a new trial and that the Court should enter judgment as a matter of law on Ms. Perez's claims.  *See* Docket No. 228.  The Court will first consider defendants' arguments that the Court should order a new trial in this case.

#### *1.  Attorney Misconduct*

##### a.  **Photographs**

Defendants maintain that counsel for Ms. Perez engaged in misconduct and they are therefore entitled to a new trial.  *Id.* at 3-8.  First, defendants argue that counsel for Ms. Perez improperly displayed photographs of other consumers who had been injured by the multicooker during opening statements without a good faith basis to believe that those photographs would be admitted into evidence during the trial.  *Id.* at 3-4.  In particular, defendants object to Ms. Perez including as part of her PowerPoint presentation a photograph of an infant who appeared to have burn injuries.  *Id.* at 4. Defendants maintain that counsel for Ms. Perez never attempted to admit these photographs into evidence.  *Id.*  Defendants assert that Ms. Perez's failure to try to introduce the photographs into evidence demonstrates that her counsel did not have a good faith basis to display the photographs during his opening statement.  *Id.* Moreover, defendants maintain that counsel for Ms. Perez displayed photographs of

other burned individuals during her closing arguments that were never admitted into evidence. *Id.* at 4-5.

Ms. Perez responds that she had a good faith basis to believe that these photographs would be admitted into evidence. Docket No. 231 at 3. Specifically, she notes that, during the trial preparation conference, the Court ruled that Ms. Perez would only be allowed to introduce evidence of injuries of other individuals where the nature of the injuries created an inference that they were caused by the lid of the multicooker explosively separating from the base, such that the incident was substantially similar to Ms. Perez's accident. *Id.* at 2; *see also* Docket No. 173 at 12:8-13:9. Ms. Perez argues that she had a good faith basis to believe that the photographs displayed to the jury were caused by incidents substantially similar to the accident that injured Ms. Perez. Docket No. 231 at 3.

Ms. Perez's argument is not responsive to defendants' main point. Pursuant to the Court's order, before Ms. Perez could introduce evidence of other injuries, she was required to show that they were caused by incidents that were substantially similar to Ms. Perez's accident. Docket No. 173 at 12:8-13:9; *see also Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1440 (10th Cir. 1992) ("Before introducing such evidence, the party seeking its admission must show the circumstances surrounding the other accidents were substantially similar to the accident involved in the present case." (citation omitted)). However, the fact that Ms. Perez had to demonstrate that her photographs were admissible under the test identified in *Four Corners Helicopters* did not relieve her of the obligation to ensure that the photographs complied with all other admissibility requirements, including laying a proper foundation for their admission. Ms.

6

Perez produced four live witnesses at trial: Ms. Perez, her mother, her treating

physician, and a product engineering expert.  None of these witnesses had the

knowledge necessary to lay a proper foundation for the photographs.  As a substitute

for any other live witnesses, the parties agreed to introduce into evidence previously

designated portions of deposition transcripts taken of defendants' employees.  The

Court ruled on the parties' objections to the deposition designations before trial.  Docket

No. 187; Docket No. 188.  The deposition testimony submitted into evidence did not

provide a foundation for Ms. Perez to introduce the photographs shown during her

opening statement.  Therefore, before the trial, Ms. Perez knew that she had no witness

who could lay a proper foundation for the photographs.  As defendants point out, Ms.

Perez did not attempt to admit these photographs into evidence.  Docket No. 228 at 4.

Thus, this is not a circumstance where a witness failed to testify as expected or where

Ms. Perez's trial strategy changed during the course of the trial.  Instead, Ms. Perez was

aware that she did not have a basis for admitting these photographs of other injured

individuals, including the injured child, into evidence, but she chose to include them in

her opening statement.  As such, the Court finds that Ms. Perez's counsel did not have

a good faith basis to display these photographs during opening statements.  "It is

unprofessional conduct to allude to any evidence unless there is a good faith and

reasonable basis for believing that such evidence will be tendered and admitted in

evidence."  *United States v. Akin*, 562 F.2d 459, 466 n.3 (7th Cir. 1977).

Defendants also argue that Ms. Perez improperly displayed photographs of

burned third-parties during closing arguments, which were not in evidence.  Docket No.

228 at 4-5.  The trial transcript indicates that defendants objected to Ms. Perez

7

displaying photographs not in evidence shortly after Ms. Perez was discussing third-parties who were purportedly burned by defendants' product.  Tr. at 572:6-16.  The Court agrees that this was improper because, during closing arguments, Ms. Perez knew the evidence had not been admitted.  "It is axiomatic that closing arguments may not be based on evidence not admitted."  *Young v. Corr. Healthcare Companies, Inc.*, 721 F. Supp. 3d 1209, 1241 (N.D. Okla. 2024) (citing *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1128-29 (10th Cir. 2009)).

However, pursuant to Fed. R. Civ. P. 61, "[u]nless justice requires otherwise, no error . . . by the court or a party . . . is ground for granting a new trial."  *See also Osterhout v. Bd. of Cnty. Comm'rs of LeFlore Cnty., Okla.*, 10 F.4th 978, 988 (10th Cir. 2021) ("The district court could not grant a new trial unless the errors had created prejudice and affected a party's substantial rights.").  The Court must consider whether Ms. Perez's counsel's "conduct was such as to impair gravely the calm and dispassionate consideration of the case by the jury."  *Cisneros v. Cutting Edge Stone, Inc.*, 2025 WL 1279187, at *6 (N.D. Ga. Mar. 27, 2025) (internal quotations and citation omitted); *see also Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1307 (11th Cir. 2020) ("an impermissible argument must gravely impair the calm and dispassionate consideration of the case by the jury" (citation and quotation omitted)).

The Court finds that displaying the photographs of other individuals who were allegedly injured by using the multicooker during opening and closing did not affect defendants' substantial rights such that, without displaying these photographs, the jury would have reached a contrary result.  First, these photographs were displayed for a brief period as part of Ms. Perez's opening and closing statements.  *See Akin*, 562 F.2d

8

at 466 (holding that the government referencing testimony in opening statement that was not later introduced did not warrant a new trial, in part, because the "reference to Giffis' testimony was brief and not given undue emphasis" (citing *United States v. West*, 486 F.2d 468, 472 (6th Cir. 1973)).

Second, before opening statements, the Court instructed the jury that the arguments of counsel are not evidence.  Tr. at 29:7-10 ("What is said in opening statements is not evidence, but it's simply an outline to help you understand what each party expects the evidence to show.").  The Court repeated this admonition before the parties' closing statements.  Docket No. 209 at 2 ("Statements and arguments of the parties are not evidence in the case.").  These instructions limited any prejudice to defendants caused by Ms. Perez displaying photographs that were not introduced into evidence.  *See Akin*, 562 F.2d at 466  ("the jury was expressly instructed not to consider statements by counsel as evidence") (citing *Frazier v. Cupp*, 394 U.S. 731, 735 (1969) ("the jury was told that the opening statement should not be considered as evidence")); *Perry v. City of New York*, 552 F. Supp. 3d 433, 445 (S.D.N.Y. 2021) (rejecting defendants' argument that "Plaintiffs' counsel improperly introduced evidence in her opening statement and published to the jury five exhibits that were not yet admitted into the trial record" because the court instructed the jury that "statements and arguments by the lawyers are not evidence" (internal, quotations, alterations, and citations omitted)).

Third, although some of the photographs displayed to the jury were not admitted into evidence, Ms. Perez did introduce photographs of injuries of other consumers.  *See* Ex. 215.  Therefore, this is not a circumstance where, but for Ms. Perez's opening

9

statement, the jury would not have been exposed to images of burn injuries to other consumers.

Finally, the Court acknowledges that a photograph of an injured infant child may have a greater tendency to inflame the passion of the jury.  However, the image was displayed for only a brief period.  Furthermore, although the image showed discoloration on small parts of the child's skin, the photograph did not show injuries as serious as the photographs of plaintiff that were admitted into evidence.  Given the brief time the photographs were displayed, the Court's instruction that the photographs were not evidence, and the fact that other photographs showing similar injuries were submitted into evidence, the Court finds that Ms. Perez displaying photographs in her opening and closing statement, which were never introduced into evidence, did not substantially affect defendants' rights or gravely impair the calm and dispassionate consideration of the case by the jury.

### b.  Video of Product Testing

Defendants argue that Ms. Perez improperly showed a product testing video during her opening statement.  Docket No. 228 at 5.  The video recorded the results of product testing by defendants and showed the lid of the multicooker explosively separating from the base.  *Id.*  Defendants maintain that Ms. Perez had no good faith basis to believe that the video would be admitted into evidence.  *Id.*

Ms. Perez responds that she had a good faith basis to believe that the video would be admitted into evidence based on defendants' witness list.  Docket No. 231 at 3.  Specifically, she notes that defendants' second amended witness list identified several witnesses that defendants may call, including Keith Coutu and Robert Miller.  *Id.* at 3-4.  Ms. Perez maintains that she believed that Mr. Coutu conducted the testing

recorded in the video, and that Mr. Miller reviewed the video as part of his work for Sunbeam. *Id.*

Ms. Perez's argument is not persuasive. For the reasons discussed above, Ms. Perez knew that, based on the portions of the deposition transcripts that would be admitted into evidence and Ms. Perez's other witnesses, she had no means of laying a proper foundation for admitting into evidence the product testing video. Moreover, counsel for defendants specifically raised this issue before opening statements. Tr. at 45:17-21. The Court instructed Ms. Perez's counsel that he had "to have a good-faith basis to believe that [the video] will be admitted at trial, not a hope-and-a-prayer basis that it would be admitted." *Id.* at 45:24-46:1. In response, counsel for Ms. Perez stated that "in the depositions one of their witnesses stated that he had reviewed all the tests and had seen" the product testing video, to which the Court replied "that could be true, but if that witness isn't testifying, then you may not be able to lay the foundation necessary to get the exhibit in." *Id.* at 46:4-10. Ultimately, the Court declined to exclude the video, stating that there "is a little bit of trust involved, but Mr. Burg says he has a good-faith basis, I believe, that he in good faith thinks he has a good-faith basis." *Id.* at 47:3-6. Nevertheless, counsel for Ms. Perez played a video he had no basis to believe would be admitted into evidence. The fact that defendants had identified Mr. Coutu as a may call witness is not a good faith basis to believe that the video would be admitted into evidence, given that defendants were under no obligation to produce evidence or specifically call Mr. Coutu as a witness. Ms. Perez displaying the video during her opening statements was therefore improper. *Akin*, 562 F.2d at 465 n.3 ("It is unprofessional conduct to allude to any evidence unless there is a good faith and

reasonable basis for believing that such evidence will be tendered and admitted in evidence.").

However, the Court finds that defendants have failed to demonstrate that they were substantially and adversely affected by Ms. Perez playing the video. As discussed above, the Court instructed the jury that nothing included in Ms. Perez's opening statement was evidence. Tr. at 29:7-10; *see also Perry*, 552 F. Supp. 3d at 445. In addition, similar to Ms. Perez's use of photographs, Ms. Perez showed only a brief portion of the product testing video. Finally, it was Ms. Perez's uncontroverted testimony that, while she was using the multicooker, the multicooker pressurized. Tr. at 282:20-23. She testified that when she touched the lid, the lid exploded from the base of the multicooker and went up into the air, after which her body was covered in hot water and steam. *Id.* at 283:14-15. In addition, Ms. Perez's treating physician provided the only testimony regarding the nature and scope of Ms. Perez's injuries. *Id.* at 344:19-435:4. Defendants did not contest that Ms. Perez's multicooker was pressurized when the lid came off or contest that she was burned by the contents of the multicooker. Instead, defendants maintained that Ms. Perez negligently failed to properly attach the lid of the multicooker as instructed in the user's manual. Given that defendants did not contest Ms. Perez's testimony that the lid of the multicooker detached from the base while it was pressurized and that there were no disputes of fact regarding the cause of Ms. Perez's injuries, the Court finds that any prejudice to defendants caused by Ms. Perez showing a video of a lid detaching from a multicooker while the unit was pressurized was minimal. Therefore, Ms. Perez's use of the video during opening

12

statements did not substantially affect defendants' rights or gravely impair the calm and dispassionate consideration of the case by the jury.

### c.  Evidence of Income

Defendants argue that, during closing arguments, Ms. Perez argued that defendants had made over a hundred million dollars selling the multicooker.  Docket No. 228 at 5; *see also* Tr. at 569:10-17 ("And they also said, guess what, through July— from July '17 through November 2020, they sold it between $70 and a hundred.  They sold over a million of these, over a million.  They made over a hundred million dollars on this product, over a hundred million.").  Defendants argue that Ms. Perez lacked any evidence to support this figure.  Docket No. 228 at 5.  They also argue that this argument was improper under Colo. Rev. Stat. § 13-21-102(6), which states that, "[i]n any civil action in which exemplary damages may be awarded, evidence of the income or net worth of a party shall not be considered in determining the appropriateness or amount of such damages."  Docket No. 228 at 5.  Defendants maintain that the amount of exemplary damages awarded by the jury, fifty million dollars, is exactly half the amount of money Ms. Perez claimed defendants made selling the product.  *Id.* Defendants assert that the jury therefore must have considered defendants' income in determining the amount of exemplary damages.  *Id.*

Ms. Perez responds that she introduced evidence that supported her assertion that defendants made over a hundred million dollars by selling the multicooker.  Docket No. 231 at 5.  Specifically, she asserts that the recall notice states that defendants sold the multicooker for between $70 and $100 and that one million units were sold.  *Id.*  The Court agrees the recall notice supports the assertion that consumers spent approximately one hundred million dollars purchasing the product.  *See* Ex. 207.  The

13

recall notice states that the multicooker was sold through retail stores and online retailers at a price ranging from $70 to $100.  *Id.* at 4.  The recall notice also states that approximately 914,430 units were sold in the United States.  *Id.* at 2.  However, this does not support the claim that defendants, as the manufacturers of the product, "made over a hundred million dollars on this product."  Tr. at 569:16-17.

Ms. Perez argues that her reference to the amount of money defendants made on the product was not improper under Colo. Rev. Stat. § 13-21-102(6).  Docket No. 231 at 5.  She maintains that "the legislative purpose of C.R.S. § 13-21-102(6) was to limit excessive punitive damages awards, and to alleviate 'the need for parties to bring financial records into court for review by the opposing side.'"  *Id.* (quoting *Corbetta v. Albertson's Inc.*, 975 P.2d 718, 722 (Colo. 1999)).  She asserts that her "counsel never referenced Defendants' financial records or the value of their companies, nor did Plaintiff try to admit Defendants' financial records into evidence."  *Id.*

In *Corbetta*, cited by Ms. Perez, the court considered whether evidence of the petitioner's tax records was discoverable.  *Corbetta*, 975 P.2d at 721.  The Colorado Supreme Court found that the financial records were not discoverable, given that § 13-21-102(6) prohibited the jury from considering the petitioner's income or net worth.  *Id. Corbetta*'s holding regarding discoverable tax information is not relevant to this case. However, *Corbetta* emphasized that the language of the statute is clear, "*evidence of the income or net worth of a party shall not be considered in determining the appropriateness or amount of [exemplary] damages.*"  *Id.* (quoting Colo. Rev. Stat. § 13-21-102(6)); *see also Gould v. Union Pac. R.R. Co.*, No. 19-cv-02326-PAB-NRN, 2022 WL 4285710, at *2 (D. Colo. Sept. 15, 2022) (granting defendant's motion in limine and

14

prohibiting plaintiff from introducing evidence of defendant's net worth in order to prove exemplary damages because the "plain language of section 13-21-102(6) clearly bars a court from considering a defendant's financial data in determining whether to award punitive damages").  The amount of money made by defendants was not relevant to any portion of Ms. Perez's claims, and her reference to the amount of money defendants made selling the multicooker was improper under Colo. Rev. Stat. § 13-21-102(6).

Nevertheless, the Court finds that defendants have failed to show Ms. Perez's improper argument "substantially and adversely" affected their rights.  *Henning*, 530 F.3d at 1217.  Section 13-21-102(6) was "added to the exemplary damages statute as part of a sweeping tort reform package enacted by the legislature" that "sought to tie punitive damage awards to the amount of the actual damages awarded, rather than to the defendant's income."  *Corbetta*, 975 P.2d at 722-23.  Under § 13-21-102(1)(a), the amount of "exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party."  Colo. Rev. Stat. § 13-21-102(1)(a).  Although the jury awarded $15,000,000 in exemplary damages against Sunbeam and $35,000,000 against Newell, Docket No. 207 at 3, the Court reduced the exemplary damages award to equal the amount of actual damages determined by the jury, namely, $1,677,695.22 against Sunbeam and $2,876,037.07 against Newell. Docket No. 219 at 1.  There is no indication that the jury used the amount of money allegedly made by the defendants when assessing the amount of actual damages in this case.  Moreover, given the size of the award of exemplary damages, the Court finds no basis to believe that, if Ms. Perez had not mentioned the amount of money made by defendants, the jury would have awarded exemplary damages below the statutory

15

maximum.  Therefore, the Court finds that defendants have failed to demonstrate that they were prejudiced by Ms. Perez's improper argument.  *See Equal Emp. Opportunity Comm'n v. Jetstream Ground Servs., Inc.*, No. 13-cv-02340-CMA-KMT, 2016 WL 8201623, at *2 (D. Colo. Nov. 3, 2016), *aff'd*, 878 F.3d 960 (10th Cir. 2017) ("Thus, it is only those errors that have caused substantial harm to the losing party that justify a new trial.  Those errors that are not prejudicial do not call for relief under Rule 59." (citation omitted)); *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 739, 771 (N.D. Ohio 2022) (a "motion for a new trial will not be granted unless the moving party suffered prejudice" (quoting *Tompkin v. Philip Morris USA,* 362 F.3d 882, 891 (6th Cir. 2004)).

### d.  Medical Expert

Defendants argue that Ms. Perez violated the Court's order excluding Ms. Perez's treating physician, Dr. Lily Daniali, from testifying about the contents of Ms. Perez's untimely supplemental disclosure.  Docket No. 228 at 5-6.  The first supplemental disclosure concerned an appointment Ms. Perez had with Dr. Daniali on November 6, 2023.  Docket No. 140 at 3.  The Court held that "Dr. Lily Daniali will not be permitted to testify about the subject matter of the first supplemental expert disclosures."  *Id.* at 9.  During cross-examination, counsel for defendants asked the following questions, and Dr. Daniali gave the following answers:

> Q. Well, and I heard you mention that you typically follow up yearly with burn patients.  You said that earlier today, correct?
>
> A. Uh-huh.
>
> Q. But you didn't see Ms. Perez personally in 2020, correct?
>
> A. I went on maternity leave and she – I did not see her in 2020.
>
> Q. And you didn't personally see her at all in 2021, correct?

16

A. I did not.

Q. And you personally didn't see her at all in 2022, correct?

A. I did not.

Q. Now, you brought up the photos that we -- that you discussed earlier with counsel.  Now, those photos were all taken in either 2019 or the very beginning of 2020, correct?

A. Yes.

Q. The most recent of those photos are over four and a half years old?

A. They are from -- you just told me the dates, 2020 -- 2019 and 2020.

Q. So they are over four and a half years old?

A. They are from 2019 and 2020.

Q. Now, those photos don't show what she looks like today, correct?

A. Well, it's inadmissible, so we can't talk about what she looks like today. I can't show you.

Q. Well, we haven't seen any photos of her today, correct?

A. I am pretty sure that's what you wanted was not to see those and not talk about future plans or those things, so we -- no, we have not delved into her current condition and future treatment planning.

Tr. at 432:23-434:2.  On redirect, counsel for Ms. Perez began to ask Ms. Perez about photographs taken of Ms. Perez at the 2023 visit.  *Id.* at 435:1-2 ("And you in the clinic took photo documentation; is that correct?").  However, the Court sustained defendants' objection, ruling that although counsel for defendants had opened the door to testimony about whether Dr. Daniali had seen Ms. Perez in 2023, Dr. Daniali could not discuss the photographs that were not properly disclosed.  *Id.*, 435:8-9 ("I said that she can testify

17

that she saw her.  She already testified that she saw Ms. Perez in 2023.").  Defendants argue that "Dr. Daniali and Plaintiff's counsel's question improperly suggested to the jury that Defendants were attempting to conceal current photographs of Plaintiff's burns."  Docket No. 228 at 6.

The Court finds that defendants have failed to show that their rights were substantially and adversely affected by Dr. Daniali's response to defendants' questioning or by Ms. Perez's question.  First, by asking Dr. Daniali whether the photograph taken 4 ½ years ago shows what Ms. Perez looked like today, defendants opened the door to the witness mentioning that she could not talk about more recent photographs.  Thus, plaintiff's attempt to ask the witness about the 2023 visit to Dr. Daniali was not improper.  Moreover, Dr. Daniali did not violate the Court's order and did not testify in any detail regarding the 2023 visit.  Additionally, the Court sustained defendants' objection to Ms. Perez's question regarding the photographs taken at the 2023 visit.  Before closing, the Court instructed the jury that "[a]ny evidence as to which an objection was sustained by the Court must be disregarded entirely."  Docket No. 209 at 3.  Because courts "generally assume[ ] jurors follow jury instructions," the Court finds that defendants have failed to show prejudice warranting a new trial.  *United States v. Urbano*, 563 F.3d 1150, 1155 (10th Cir. 2009).

Defendants next argue that Ms. Perez elicited misleading testimony from Dr. Daniali about whether she was a retained expert.  Docket No. 228 at 5-6.  During trial, counsel for Ms. Perez asked Dr. Daniali, "[s]o you are not testifying as a retained expert retained by my law firm," to which Dr. Daniali replied "[n]o. I am speaking as someone that took care of her when she was injured."  Tr. at 348:25-349:3.  Defendants argue

18

that this testimony was misleading because Ms. Perez has since disclosed that she compensated Dr. Daniali over $40,000 for work she provided on this case. Docket No. 228 at 6. Defendants maintain that, had Ms. Perez "disclosed these invoices before trial, . . . defense counsel could have cross-examined Dr. Daniali on her bias in the case, as it is now apparent she was paid a substantial amount of money for her testimony." *Id.*

First, Dr. Daniali did not testify as a "retained" expert witness under Federal Rule of Civil Procedure 26(a)(2)(B) because she did not provide opinions that she developed specifically for trial, but instead testified as a treating physician who developed opinions while treating Ms. Perez. *See RDA Hotel Mgmt. Co. v. Hudson Specialty Ins. Co.*, No. 19-cv-02145-DDD-NYW, 2020 WL 6385343, at *2 (D. Colo. June 29, 2020) (a treating physician is the "paradigmatic non-retained expert witness"). Dr. Daniali's testimony that she was testifying as a treating physician is consistent with the opinions she provided at trial. Second, although defendants argue that they were prejudiced by the fact that they could not cross-examine Dr. Daniali about the amount she was compensated for testifying, the jury was aware that Dr. Daniali was being paid for her time. During Dr. Daniali's direct examination, Ms. Perez's counsel asked her: "are you being compensated for your time being in court here today," to which Dr. Daniali testified, "Yes, ma'am, I am." Tr. at 348:11-13. Dr. Daniali also testified that she is a highly qualified surgeon with board certifications in plastic surgery and hand surgery. Tr. at 346:18-23. She explained that, because she was testifying on a "surgery day," during which she would typically perform between six and ten operations, "it requires compensation because there is a big financial cost to me to be here." Tr. at 348:14-19.

19

Considering Dr. Daniali's credentials and the circumstances of her providing testimony in this case, the Court finds that defendants' inability to cross-examine Dr. Daniali regarding the $40,000 that Ms. Perez paid her in compensation was unlikely to materially affect any credibility determinations made by the jury over Dr. Daniali's testimony.  Therefore, defendants' rights were not substantially and adversely affected.

### e.  Other Incidents

Defendants argue that Ms. Perez's counsel violated the Court's order requiring Ms. Perez to lay a proper foundation before introducing evidence of other incidents by establishing that the evidence is substantially similar.  Docket No. 228 at 8.  Before trial, defendants filed a motion in limine to prohibit Ms. Perez from introducing evidence of other lawsuits, claims, and incidents that were not substantially similar to Ms. Perez's accident.  Docket No. 111.  At the Trial Preparation Conference, the Court ruled that Ms. Perez could only introduce evidence of events that were substantially similar to the accident in this case.  Docket No. 173 at 12:8-13:9.  Specifically, the Court ruled that Ms. Perez could only introduce evidence of events that involved a substantially similar model of multicooker and that involved the lid of the multicooker explosively separating from the base.  *Id.*  The Court also ruled that evidence of injuries from these events could be introduced as part of laying a foundation that the events were substantially similar if the injuries demonstrate they were caused by similar forces.  *Id.*  Defendants argue that Ms. Perez violated the Court's order by "(1) the plaintiff's counsel opening statement referring to 126 and possibly more people being burned (Transcript at 60:20-61:12); (2) the admission of Exhibit 197 without any purported testimony concerning the similarity of any of the incidents referenced therein (Transcript at 245:16-250:18); [and] (3) the recall notice identifying many other incidents by number only."  Docket No. 228

20

at 9.  As discussed in more detail below, Ms. Perez's reference to the number of

individual's injured, Exhibit 197, and the number of individuals referenced in the recall

notice all concern whether the Court erred in admitting evidence of the defendants'

recall of the multicooker.

Defendants' third motion in limine asked the Court to exclude reference to the

recall of the multicooker.  Docket No. 113.  The Court denied the motion during the trial

preparation conference.  Docket No. 173 at 20:2-21.  The Court found that evidence of

the recall was relevant to the issue of punitive damages for Ms. Perez's tort claims.  *Id.*

Defendants filed a motion to reconsider, Docket No. 153, which motion the Court

denied.  Docket No. 182.  The Court explained that, in *Forma Sci., Inc. v. BioSera, Inc.*,

960 P.2d 108, 112 (Colo. 1998), the Colorado Supreme Court held that Colorado Rule

of Evidence 407, which applied to Ms. Perez's state law tort claims, did not prohibit

evidence of subsequent remedial measures in a strict product's liability action.  *Id.* at 4.

Here, defendants argue that the Court erred in admitting evidence of the recall

for three reasons.  First, they argue that evidence of the recall should have been

excluded under Federal Rule of Evidence 403.  Docket No. 228 at 10.  For the reasons

discussed in the Court's prior rulings, the Court finds that admission of evidence of the

recall did not violate Rule 403 because its probative value on the issue of defendants'

willful or wanton conduct, which was the basis of Ms. Perez's punitive damages claim,

was not substantially outweighed by a danger of unfair prejudice.  Next, defendants

argue that *Forma* is distinguishable on the basis that *Forma* did not specifically address

a product recall.  *Id.* at 11.  The Court rejected this argument in ruling on the motion to

reconsider and again rejects the argument for the same reasons.  Docket No. 182 at 5-6.

Finally, defendants argue that evidence of the recall should not have been admitted because Colorado law does not recognize a duty a recall a defective product. Docket No. 228 at 12.  Defendants argue that, "[d]espite no support under Colorado law, a nonexistent duty to recall the subject product is exactly what Plaintiff's counsel argued to the jury in this case."  *Id.* at 13.  Defendants cite the following portion of the trial transcript as evidence that Ms. Perez argues that defendants had a "duty to recall" the product:

> They delayed the recall until the profits had been made and sales had slowed. Who are these people? . . .
>
> It was delayed intentionally. From the -- 859 days from the day they knew it would explode to the time it was recalled. Oh, my god. They were playing lid roulette. . . .
>
> And why did they wait two and a half years? So they could keep selling the product. Why didn't they do it right away?

*Id.* (citing Tr. at 570:22-24; 572:9-12; 608:20-22).  As previously discussed by the Court, evidence of the recall notice was relevant to Ms. Perez's claim for punitive damages. Colorado law provides that, "[i]n all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages."  Colo. Rev. Stat. § 13-21-102(1)(a).  Section § 13-21-102(1)(b) provides that willful and wanton conduct "means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and

recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Id.*, § 13-21-102(1)(b). Therefore, the issue is not whether Colorado law imposes a duty to recall defective products. Instead, Colorado law allows juries to award punitive damages if the injuries caused by defendants' sale of a defective product were attended by circumstances of fraud, malice, or willful and wanton conduct. For the reasons discussed in the Court's order applying the damages cap in this case, Ms. Perez's evidence of the recall was probative of the fact that her injuries were attended by willful and wanton conduct. Docket No. 218 at 10. Therefore, the Court finds that it was appropriate to allow Ms. Perez to introduce evidence of the recall.[1]

Defendants argue that Ms. Perez's evidence of the recall should have been excluded because Ms. Perez failed to show that the events that caused the recall were substantially similar to Ms. Perez's accident. Docket No. 228 at 8-9. During opening statements, counsel for Ms. Perez stated, "[w]hat we do know is they had 126 reported incidents all the way through the time of the recall and beyond." Tr. at 61:4-6. Ms. Perez's argument appears to be a reference to the recall notice, which indicates that Sun Beam received "119 reports of lid detachment, resulting in 99 burn injuries ranging in severity from first-degree to third-degree burns." Exhibit 207 at 4. The Court finds that defendants have not shown that their substantial rights were affected by this

---

[1] To the extent that defendants argue that they were prejudiced by Ms. Perez implying that defendants had a duty to recall the product, the Court does not find that defendants' substantial rights were prejudiced. First defendants do not argue that Ms. Perez ever expressly argued that Colorado law imposed on defendants a duty to recall the product. Second, defendants do not argue that the Court failed to properly instruct the jury on the elements of an award for punitive damages.

remark.  As discussed above, the jury was instructed that Ms. Perez's opening statement was not evidence.  Tr. at 29:7-10 ("What is said in opening statements is not evidence, but it's simply an outline to help you understand what each party expects the evidence to show."); *see also Perry*, 552 F. Supp. 3d at 445.  Moreover, there was evidence that defendants received at least 119 reports of lid detachment, and Ms. Perez's representation that defendants received 126 reports of lid detachment is not likely to have affected the outcome in this case.

Defendants argue that they are entitled to a new trial because of the admission of Exhibit 197.  Docket No. 228 at 9.  Exhibit 197 is a table created by Sunbeam that tracks incidents reported to the company regarding injuries arising from the multicooker. *See* Exhibit 197; *see also* Tr. at 249:9-15.  The table includes identifying information about the consumer who reported the incident, the date Sunbeam received the report, and a description of the incident, among other information.  *See* Exhibit 197.  During trial, defendants objected to the admission of Exhibit 197 on the basis that Ms. Perez failed to show that the incident reports concerned accidents that were substantially similar.  Tr. at 245:21-22.  The Court overruled the objection on the basis that the table was provided to the Consumer Product Safety Commission and was relevant to the reason for the recall.  *Id.* at 250:2-18.  Therefore, Exhibit 197 was relevant both to the issue of notice and to the issue of whether defendants' conduct surrounding the manufacture and sale of the multicooker was attended by willful and wanton conduct. Fed. R. Evid. 105 states that, "[i]f the court admits evidence that is admissible . . . for a purpose—but not . . . for another purpose—the court, *on timely request*, must restrict the evidence to its proper scope and instruct the jury accordingly." (emphasis added).

24

Thus, if defendants believed Exhibit 197 was irrelevant for other purposes, they should have requested a limiting instruction, which they did not do.  *See* Tr. at 245-250.

"Evidence proffered to illustrate the existence of a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury." *Four Corners Helicopters*, 979 F.2d at 1440 (citation omitted).  "The requirement of substantial similarity is relaxed, however, when the evidence of other incidents is used to demonstrate notice or awareness of a potential defect." *Id.*  Based on the more relaxed substantial similarity requirement for evidence of notice, the Court finds that it did not err in admitting Exhibit 197.  Many of the incidents describe the multicooker "exploding" and involving serious burns based on the ejection of hot contents from the multicooker.  *See* Exhibit 197 ("Consumer in hospital Missing 40% skin on abdomen, more missing on arms and hand. . . .  When started to take lid off, the crockpot exploded"; "My daughter's exploded with minor steam burns on her arms"; "It wasn't more than 6 minutes when the lid exploded off"; "[w]hile cooking soup using the soup/pressure cooker feature, I had an explosion of soup all over"; "[t]he top blew off and the fluid inside blew all over"; "HE THEN TURNED THE HANDLE AND THE CROCKPOT EXPLODED"; consumer "ASSUMED IT WAS BEGINNING TO COOK WHEN ALL OF A SUDDEN THE LID BLEW OFF"; "THEN THE LID BLEW OFF AND THE CONTENTS WENT ONTO SHAMIAH").  The descriptions of the incidents identified in the table, which reference the multicooker exploding or the lid suddenly separating from the base, are sufficient to establish substantial similarity for the table to be admissible evidence of the fact that defendants had notice of the defect, as well as evidence of the period of time between defendants' potential notice of the defect and

25

their actions to protect consumers from the defect.  There are, however, some entries that indicate that the incident was not substantially similar.  *See, e.g.*, *id.* (noting that, while the contents of the multicooker burned the consumer, the "*LID STAYED ON*").  However, defendants did not ask for a limiting instruction to ensure this evidence was not being used for an improper purpose.  Moreover, defendants fail to show that the inclusion of some entries of incidents that were not substantially similar substantially affected their rights.  The descriptions of incidents that are not substantially similar include sufficient information to distinguish them from events where the lid explosively separated from the base, and therefore the jury had information from which it could distinguish the recorded incident from the events of this case.  Additionally, although the table includes 38 entries, the recall notice indicates that Sun Beam received 119 reports of lid detachment.  Exhibit 207 at 4.  Therefore, there was evidence that suggested that the total number of reported incidents exceeded the number of incidents reported in the table.  As such, defendants cannot show prejudice by the fact that the table identified 38 incidents because the evidence indicated that there were more than 38 reported incidents of lid detachment.  Accordingly, the Court finds that defendants have failed to show that their rights were substantially affected by the admission of evidence of some events which caused injury but were not substantially similar to explosive lid detachment in this case.

Finally, defendants argue that they have been prejudiced because the recall notice, which was admitted into evidence, identifies "many other incidents by number only."  Docket No. 228 at 9.  As discussed above, the recall notice states that Sunbeam received 119 reports of incidents involving the multicooker, 99 of which resulted in

26

injuries to consumers.  Exhibit 207 at 4.  However, defendants are incorrect that the

recall notice identifies the incidents "by number only."  Docket No. 228 at 9.  Instead, the

recall notice states that the "recalled Crock-Pot multi-cooker can pressurize when the lid

is not fully locked" and that this "can cause the lid to suddenly detach while the product

is in use, posing burn risks to consumers from hot food and liquids ejected from the

product."  Exhibit 207 at 2.  Moreover, the recall notice identifies each of the 119 reports

and "reports of lid detachment" and further specifies that 99 injuries were "burn injuries."

*Id.* at 4.  Based on the general description of the danger provided in the recall notice as

well as the specific reference to "lid detachment" and "burn injuries" for the 119 reports

made to Sunbeam, the Court finds that defendants have not shown that their rights

were substantially and adversely affected by introducing evidence of the recall, which

included sufficient information to demonstrate that the incidents referenced were

substantially similar to the Ms. Perez's accident for purposes of notice.

### f.  Cumulative Error

Defendants argue that, even if none of the errors identified above substantially

affected their rights, the cumulative effect of these errors warrants a new trial.  The

Tenth Circuit has identified four factors that "bear on whether attorney misconduct

merited a new trial: (1) the pervasiveness of the misconduct, (2) the taking of curative

action, (3) the size of the verdict, and (4) the weight of the evidence."  *Osterhout v. Bd.*

*of Cnty. Commissioners of LeFlore Cnty., Oklahoma*, 10 F.4th 978, 991 (10th Cir.

2021).  "In considering the four factors and the cumulative effect of the misconduct, the

Court must remember that the ultimate question is whether the misconduct 'influenced

the verdict.'"  *Young v. Corr. Healthcare Companies, Inc.*, 721 F. Supp. 3d 1209, 1247

(N.D. Okla. 2024) (citing *Osterhout*, 10 F.4th at 992).  "The cumulative effect of two or

more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. The purpose of a cumulative-error analysis is to address that possibility." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990).

"Cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors." *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998). Therefore, the Court will not consider any negative effects on defendants' case caused by Dr. Daniali's testimony, evidence of the recall, or evidence of events that were substantially similar under the similarity requirement for notice. Instead, the Court will focus on Ms. Perez displaying photographs and videos that were not admitted into evidence and introducing evidence of events that were not substantially similar.

The Court finds that, while it is true that counsel for Ms. Perez displayed multiple images and videos which were never introduced into evidence, the Court does not find that counsel's conduct was so pervasive as to weigh in favor granting a new trial. Instead, counsel's use of these images was brief and was predominantly confined to his opening statement. Moreover, although counsel for Ms. Perez failed to redact information regarding incidents that were not substantially similar from Exhibit 197, the majority of the incidents recorded in the table indicate that they involved lid detachment. Counsel for Ms. Perez otherwise respected and abided by the Court's rulings. Therefore, the Court finds that the first *Osterhout* factor does not weigh in favor of granting a new trial.

Regarding the taking of curative action, the Court finds that it instructed the jury that both opening and closing statements were not evidence, and that this instruction

28

appropriately addresses any prejudice to defendants caused by Ms. Perez's improper arguments. Moreover, although the Court acknowledges that defendants made a generalized objection to the admission of Exhibit 197, for the reasons discussed above, most of Exhibit 197 was admissible. Defendants made no effort to identify with particularity those incident reports that were not substantially similar because they did not involve the lid of the multicooker separating from the base. Finally, defendants did not request any other curative instruction regarding any undue prejudice caused by Ms. Perez's presentation of her case. Therefore, the Court finds that the second *Osterhout* factor does not weigh in favor of granting a new trial.

The size of the verdict weighs in favor of granting a new trial. The jury awarded Ms. Perez $3,500,000 for non-economic losses or injuries and $2,000,000 for physical impairment and disfigurement. Docket No. 207 at 3. The jury also awarded Ms. Perez $15,000,000 in exemplary damages against Sunbeam and $35,000,000 against Newell. *Id.* This is a substantial verdict, even considering Ms. Perez's medical expenses for receiving extensive treatment for her second and third degree burns. However, as noted earlier, the Court has already reduced the jury award by finding that Ms. Perez is entitled to punitive damages equal to her award of actual damages. Nevertheless, the third *Osterhout* factor weighs in favor of granting a new trial.

Finally, the Court finds that the weight of the evidence does not weigh in favor of granting a new trial. Ms. Perez introduced evidence that showed that the multicooker could turn on when the lid was not in the properly locked position. Moreover, her expert testified that it was a design flaw in the product for the device to allow the lid to attach and appear locked when it was not in the properly locked position. Finally, for the

29

reasons discussed in the Court's ruling on defendants' motion for judgment as a matter

of law and discussed in the Court's order applying the damages cap, Docket No. 218,

Ms. Perez produced sufficient evidence for the jury to conclude that defendants'

conduct was willful and wanton.

Considering each of the errors discussed above collectively, and in light of the

*Osterhout* factors, the Court finds that there was not sufficient cumulative error in this

case to warrant granting defendants' motion for a new trial.

### B.  Renewed Motion for Judgment as a Matter of Law

The Court will next consider defendants' arguments that the Court should grant

judgment as a matter of law.  Pursuant to Fed. R. Civ. P. 50(b), a party who moved for

judgment as a matter of law during trial pursuant to Rule 50(a) may file a renewed

motion for judgment as a matter of law no later than 28 days after the entry of judgment.

Here, final judgment was entered on May 29, 2025, Docket No. 219, and defendants

timely filed a renewed motion for judgment as a matter of law on June 26, 2025.  Docket

No. 228.

### 1.  *Exemplary Damages*

Defendants argue that they are entitled to judgment as a matter of law on Ms.

Perez's request for exemplary damages.  *Id.* at 14.  Under Colo. Rev. Stat. § 13-21-

102(1)(a), "[i]n all civil actions in which damages are assessed by a jury for a wrong

done to the person or to personal or real property, and the injury complained of is

attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in

addition to the actual damages sustained by such party, may award [her] reasonable

exemplary damages."  "Willful and wanton conduct is defined as 'conduct purposefully

committed which the actor must have realized as dangerous, done heedlessly and

recklessly, without regard to consequences, or of the rights and safety of others,
particularly the plaintiff.'"  *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1081 (Colo.
2011) (quoting Colo. Rev. Stat. § 13-21-102(1)(b)).

Defendants argue that Ms. Perez's claim for exemplary damages fails because
she "did not present any evidence necessary to establish that Sunbeam or Newell
maliciously, willfully, or wantonly failed to exercise reasonable care to protect [Ms.
Perez] from dangers of which it actually knew or should have known."  Docket No. 228
at 14.  Specifically, defendants contend that the details of the multicooker's recall
cannot serve as a basis for exemplary damages because Colorado law imposes no duty
to recall a product.  *Id.* at 16-17.  However, the absence of a general duty to recall does
not preclude a finding that the facts surrounding this particular recall show that
defendants willfully and wantonly failed to protect Ms. Perez from foreseeable danger.
The jury was presented with enough evidence to reasonably draw that conclusion.
Specifically, Mr. Rubia, a senior quality manager at Sunbeam, stated that Sunbeam was
aware of potential injuries caused by its product as far back as 2017.  Tr. at 86:14-23.
Nevertheless, Mr. Galambos, a senior regulatory manager at Newell, noted that the
product was not recalled until the Consumer Product Safety Commission ("CPSC")
recommended recalling the product in 2020.  Docket No. 231-6 at 19, 45:14-23.  This
was the case even though it was known that delaying the recall could potentially cause
more injuries.  *Id.* at 8, 19:12-20.  Thus, a reasonable jury could find that not recalling
the multicooker until 2020 constituted a willful failure to exercise reasonable care in
protecting Ms. Perez against a foreseeable danger.  Moreover, Sunbeam hired
Exponent, an engineering consulting firm, to evaluate why the multicooker was causing

31

injuries.  Tr. at 114:17-24.  However, neither Mr. Sumser, a program manager at

Sunbeam, nor Mr. Galambos were made aware of Exponent's report in a timely

manner.  Tr. at 138:8-10; Docket No. 231-6 at 16, 39:3-9.  A reasonable juror could

conclude that this was because defendants were hiding the Exponent report from its

own executives.  This further supports a finding that defendants were engaging in willful

or wanton conduct that could give rise to exemplary damages.

Defendants point to evidence presented at trial which tends to show that

Sunbeam did take proactive steps to protect consumers upon learning about the injuries

caused by its product in 2017.  Docket No. 228 at 15-16.  However, in a Rule 50(b)

motion, the pertinent question is not whether the moving party has evidence to support

its position.  Rather, the court can only grant relief "where the proof is all one way or so

overwhelmingly preponderant in favor of the movant so as to permit no other rational

conclusion."  *Hinds*, 988 F.2d at 1045.  Here, there is sufficient evidence for a

reasonable jury to believe that defendants did not recall the multicooker until almost

three years after learning about potential defects, that defendants delayed this recall

despite knowing it might lead to more injuries, and that defendants hid information about

the multicooker's defects from its own executives.  Such conclusions could rationally

lead the jury to find that defendants engaged in willful and wanton conduct which

caused Ms. Perez's injuries.  Accordingly, the Court will not grant judgment as a matter

of law to defendants on Ms. Perez's request for exemplary damages.

### 2.  *Manufacturer*

Newell argues that it is entitled to judgment as a matter of law on Newell's

assertion that it is not a manufacturer of the multicooker.  Docket No. 228 at 17-18.

Newell largely repeats its arguments from its motion for summary judgment, Docket No.

32

50, on which the Court ultimately ruled that there was a genuine dispute over whether Newell is a manufacturer.  Docket No. 84 at 8.  Under Colo. Rev. Stat. § 13-21-401(1), a "manufacturer" is defined as, "a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product prior to the sale of the product to a user or customer."  "The intent of this section is to extend liability to those entities involved in the production of the product or otherwise in control [of] the production process."  *Yoder v. Honeywell Inc.*, 900 F. Supp. 240, 246 (D. Colo. 1995), *aff'd*, 104 F.3d 1215 (10th Cir. 1997).  "Section 13-21-401 contemplates the possibility that a product can have more than one manufacturer."  *Heinrich v. Master Craft Eng'g, Inc.*, 131 F. Supp. 3d 1137, 1153 (D. Colo. 2015).

Newell notes that that the original design of the multicooker was developed by Jiangmen Nanguang Electrical Appliance Co. Ltd. ("Nanguang").  Docket No. 228 at 18.  However, because there can be more than one manufacturer under Section 13-21-401, this does not preclude a finding that Newell was also a manufacturer of the multicooker.  In its summary judgment order and in ruling on the Rule 50(a) motion on this matter, the Court relied, in part, on the Production Start Authorization Newell Internal Approval Form (the "PSA").  Docket No. 84 at 6-8; Tr. at 643:5-644:8.  The PSA, dated May 19, 2018, contains the Newell logo and states, "[t]his project is to change the material of [the] lid lock lever from Aluminum to Stainless steel, add 0.5mm for length of the lid lock pin head, adjust the dimension tolerance of the middle pot rim close to its upper limit level, [and] change the bobber valve to red color."  Exhibit 190 at 48.  Newell argued that under *Yoder*, the PSA could not show that Newell was a manufacturer.  Docket No. 50 at 6.  The Court found that "[t]his evidence creates a genuine dispute of material fact

33

regarding whether Newell designed or participated in the production of the Multi-Cooker's lid and locking mechanism."  Docket No. 84 at 7.

Newell once again argues that, under *Yoder*, the PSA does not provide sufficient evidence for a jury to find that Newell is a manufacturer.  Docket No. 228 at 19-20.  In *Yoder*, the plaintiffs argued that Honeywell was liable for injuries caused by a keyboard because its trademark appeared on the product.  900 F. Supp. 240 at 245.  However, the court ruled that merely permitting a manufacturer to use a trademark on its product does not expose the holder of that trademark to liability.  *Id.* at 245-46.  Rather, the plaintiffs must proffer evidence to show that the company "manufactured, sold, or distributed the product, provided specifications for the production of the product, or exercised significant control over the production of the product."  *Id.* at 246.  Newell argues that the PSA in this case is comparable to the keyboard in *Yoder*, and that Newell cannot be exposed to liability merely because its logo appears on the PSA. Docket No. 228 at 20.  However, this misses the point of why the PSA is incriminating. Unlike the keyboard in *Yoder*, the PSA does not feature the Newell logo on a finished product.  Rather, it features the Newell logo on an internal form that details the specifications for the new design of the multicooker.  Exhibit 190 at 48.  Thus, it tends to prove that Newell had control over the design of and provided specifications for the production of the multicooker.

Moreover, other evidence was presented which further demonstrates Newell's involvement with the multicooker.  Mr. Galambos, a senior regulatory manager at Newell, testified that he was communicating with the CPSC about the multicooker.

34

Docket No. 231-6 at 13, at 27:5-15.[2]  Additionally, Mr. Rubia testified that "Sean" was

present at a meeting regarding the safety of the multicooker.  Tr. at 115:9-22.  The

"Sean" that Mr. Rubia references is almost certainly Sean Beckstrom, Newell's general

counsel.  On the other hand, Newell argues that Mr. Galambos made many statements

downplaying Newell's involvement with the multicooker and that there is no testimony

plainly showing that Newell employees were directly involved with the design indicated

on the PSA.  Docket No. 238 at 19.  However, in a motion for judgment as a matter of

law, it is not the role of the Court to make credibility determinations or weigh the

evidence.  *Reeves*, 530 U.S. at 150.  Rather, the Court must determine whether a

reasonable jury would have a legally sufficient evidentiary basis to find that Newell was

a manufacturer.  Fed. R. Civ. P. 50(a)(1).  Based on the above evidence, the Court

concludes that a reasonable jury could find that Newell was a manufacturer.

Accordingly, the Court does not grant judgment as a matter of law on this issue.

### 3.  Defective Product

Next, defendants argue that they are entitled to judgment as a matter of law

because Ms. Perez failed to prove that the multicooker was defective and unreasonably

dangerous.  Docket No. 228 at 21.  Specifically, defendants argue that plaintiff did not

present enough evidence to show that the product was defective under the risk-benefit

analysis.  *Id.* at 21-22.  However, defendants failed to raise this argument when making

their Rule 50(a) motions at trial.  *See* Tr. at 466:4-488:13.  The Tenth Circuit has held

---

[2] Instead of calling Mr. Galambos to testify at trial in-person, plaintiff called him to testify by video deposition as an adverse witness.  Tr. at 230:15-16.  The trial transcript does not contain his video testimony, but states that "the videotaped deposition of David Galambos was played."  Tr. at 231:17-18.  Thus, the Court will cite Mr. Galambos's deposition, attached to Ms. Perez's response as Docket No. 231-6, instead of citing the trial transcript.

that "[a]rguments presented in a Rule 50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion." *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017) (citing *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1266 (10th Cir. 2016); *see also Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1131 (10th Cir. 2019) ("A party can renew its motion for judgment as a matter of law under Rule 50(b) after the jury returns a verdict . . . .  A Rule 50(b) movant, however, can only reassert the same grounds for judgment as a matter of law that he first asserted in his pre-deliberation Rule 50(a) motion.").

When making their Rule 50(a) motions, defendants argued that Ms. Perez did not provide evidence to prove causation or to show the applicable standard of care.  Tr. at 471:8-11; 19-20.  However, defendants did not argue that Ms. Perez was unable to prove that the multicooker was defective.  In fact, defendants repeatedly noted that plaintiff's expert witness was able to give an opinion on whether the multicooker was defective.  *Id.*  The only time in their Rule 50(a) motions where defendants could conceivably have been discussing the risk-benefit analysis was when they noted that plaintiff's expert "did not give an opinion on an alternative design for the lid of the unit." Tr. at 485:8-9.  However, this brief statement was spoken between defendants' discussion on the standard of care and exemplary damages and did not clearly present a new ground for granting judgment as a matter of law.  Moreover, when ruling on the Rule 50(a) motion, the Court did not discuss whether Ms. Perez failed to prove that the multicooker was defective under the risk-benefit test.  Neither defendant clarified that they sought judgment as a matter of law on whether the product was defective under

the risk-benefit test.  Accordingly, defendants did not raise this issue when making their Rule 50(a) motions and it is therefore waived.

### 4.  Standard of Care

Finally, defendants argue that they are entitled to judgment as a matter of law because Ms. Perez did not present evidence of the applicable standard of care and how it was breached.  Docket No. 228 at 24.  Thus, they argue that Ms. Perez cannot succeed in her negligence cause of action.

Citing *Palmer v. A.H. Robins Co.*, 694 P.2d 187, 210 (Colo. 1984), defendants assert that Ms. Perez must present expert testimony to establish the standard of care and show how defendants breached it.  Docket No. 228 at 24.  However, the holding in *Palmer* supports the opposite conclusion.  There, the plaintiff brought a negligence claim based on the sale of an allegedly defective intrauterine device.  *Palmer*, 694 P.2d at 210.  The defendant sold the intrauterine device despite the fact that it was minimally tested and that there was information indicating that there were significant dangers associated with using the product.  *Id.*  The court acknowledged that expert testimony might be required to establish the standard of care when there are questions beyond the competence of ordinary persons.  *Id.* at 209-210.  However, the court noted that such expert testimony was not required under the facts of the case because it was "well within the ken of persons of ordinary intelligence" whether a reasonably prudent drug manufacturer would continue distributing a product when there was evidence that it was dangerous.  *Id.* at 210.  Here, Ms. Perez's negligence claim is similarly based on the assertion that it was negligent for defendants to sell the multicooker despite having evidence that it was dangerous.  Thus, like the plaintiff in *Palmer*, she did not need to present expert testimony to establish the standard of care.  And, as the Court will

discuss below, even if Ms. Perez did need expert testimony to establish the standard of care, she presented such expert testimony at trial.

Defendants argue that, even if expert testimony was not needed to establish the standard of care, Ms. Perez still failed to present evidence regarding the standard of care and how it was breached. Docket No. 228 at 24-25. However, while there was no explicit testimony regarding the standard of care, Ms. Perez still presented sufficient evidence for the jury to determine the applicable standard of care in this case. Specifically, Ms. Perez's expert witness, Dr. Eshraghi, testified that products should be "fail-safe" before being put on the market. Tr. at 183:13-184:8. Dr. Eshraghi further testified that for the multicooker to be fail-safe, it should not pressurize if it is not locked properly. Tr. at 188:2-6. Additionally, Mr. Galambos testified that, generally speaking, if a consumer product has a defect that causes catastrophic injuries, then the manufacturer must get that product off the market as soon as possible. Docket No. 231-6 at 7, 18:11-19. Finally, when Mr. Sumser was asked whether he would suggest changes be made to the multicooker if he was aware the lid could be removed under pressure, he testified that "[Sunbeam] could not duplicate any failure of that sort." Tr. at 172:18-173:5. He further testified that consumers should have been able to assume that the lid could not be removed while pressurized. Tr. at 173:6-10. Through this testimony, a reasonable jury could determine that the applicable standard of care is that manufacturers have a duty not to market defective products. A reasonable jury could further conclude that defendants breached that standard of care by selling a multicooker whose lid could detach while the multicooker is pressurized. Accordingly, the Court will

deny judgment as a matter of law pursuant to Rule 50(b) on defendants' argument that

Ms. Perez never established the standard of care.

## IV. CONCLUSION

Accordingly, it is

**ORDERED** that the Motion for a New Trial and Judgment as a Matter of Law

[Docket No. 228] is **DENIED**.

DATED March 31, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge